J-A13004-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TRUSTS UNDER WILL OF ROBERT L. MONTGOMERY, JR. DECEASED FOR THE BENEFIT OF H.BEATTY CHADWICK (TRUST NO. 6) AND MARITAL TRUST UNDER WILL OF ROBERT L. MONTGOMERY, JR., DECEASED, FOR THE BENEFIT OF ELIZABETH B. MONTGOMERY AS APPOINTED BY THE WILL OF ELIZABETH B. MONTGOMERY, DECEASED FOR THE BENEFIT OF H. BEATTY CHADWICK (TRUST NO. 7) | : : : : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br>No. 3007 EDA 2019 |
| APPEAL OF: H. BEATTY CHADWICK | : | |

Appeal from the Order Entered September 30, 2019
In the Court of Common Pleas of Montgomery County Orphans' Court
Division at No(s): No. 1977-X0448

BEFORE: BENDER, P.J.E., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY BENDER, P.J.E.:                    Filed: August 13, 2020

H. Beatty Chadwick (Appellant) appeals *pro se* from the orphans' court's adjudication of the 2018 accounts of two trusts created under the will of Robert L. Montgomery, Jr., (Decedent), and the will of Elizabeth B. Montgomery, the deceased wife of Decedent. Pursuant to the court's adjudication, Appellant's objections were dismissed and the payment of attorney's fees to PNC Bank, N.A. (Trustee/Appellee) was approved. We affirm.

As noted in a prior decision by this Court, responding to an earlier appeal filed by Appellant, this matter has a "long, torturous, and infamous" history.

*See In re Trusts Under the Will of Montgomery*, 161 A.3d 392 (Pa. Super. 2017) (unpublished memorandum). The terms of the trusts provided that Appellant was to be the lifetime beneficiary of the trusts and that after Appellant's death, the principal of each trust was to be distributed to various charities. Specifically, with regard to the amount of the payment due Appellant, he was to receive a percentage of the lesser of the net income of the trust or a stated percentage of the fair market value of the principal of the trust.

The present appeal arises from the filing of the fifth accounting of trust #6 and the third accounting of trust #7. As part of the petitions for adjudication of the accounts, Appellee requested the payment of attorney's fees in the amount of $447,635.40 to cover the costs incurred by it, which were expended to defend itself against Appellant's claims, both past and present. Following the filing of these petitions, Appellant filed objections alleging Appellee breached its fiduciary duties relating to the investment of the trusts' assets and asserting that its request for attorney's fees should be denied.

A hearing was held on February 26, 2019, at which the court heard testimony and received evidence. On September 30, 2019, the court issued its adjudications, dismissing Appellant's objections and approving the payment of the attorney's fees. The orphans' court also denied Appellant's motion for reconsideration. Thereafter, Appellant filed a timely appeal.

We begin by setting forth our standard of review.

Our standard of review of the findings of an Orphans' Court is deferential.

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.
>
> However, we are not constrained to give the same deference to any resulting legal conclusions.
>
> *In re Estate of Harrison*, 745 A.2d 676, 678-79 (Pa. Super. 2000), *appeal denied*, 563 Pa. 646, 758 A.2d 1200 (2000) (internal citations and quotation marks omitted). "The Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa. Super. 2003), *appeal denied*, 577 Pa. 722, 847 A.2d 1287 (2003).

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (quoting *In re Estate of Whitley*, 50 A.3d 203, 206-07 (Pa. Super. 2012)).

Appellant raises the following two issues for our review:

1. Where the trustee of trusts with a beneficiary entitled only to receive trust income invests for total return principally by capital appreciation and the trusts achieve substantial capital appreciation, did the court below err in dismissing objections to [a]ccounts that the trustee violated fiduciary duties by refusing to exercise its statutory power to adjust the total return of the trusts to produce income which will accomplish the purposes of the trusts as set forth in the terms thereof?

2. Whether the court below abused its discretion in allowing a trustee to collect from trusts additional counsel fees and

expenses of $477,635.40 for an [a]ccounting proceeding where $516,733.78 already had been allowed for such purposes, 1,874 hours were billed by counsel to represent the trustee in such proceeding where the evidentiary hearing was less than one day, and total fees and expenses allowed were 88% of the combined assets of the trusts?

Appellant's brief at 37.

We have reviewed the certified record, the briefs of the parties, the applicable law, and the thorough 17-page opinion of the Honorable Lois E. Murphy of the Court of Common Pleas of Montgomery County, dated September 30, 2019. We conclude that Judge Murphy's opinion properly disposes of the issues and accompanying arguments presented by Appellant. Accordingly, we adopt her opinion as our own and affirm the order dismissing Appellant's objections.

Order affirmed.

Judge Dubow joins this memorandum.

Judge Lazarus files a concurring statement in which President Judge Emeritus Bender and Judge Dubow join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/20

- 4 -

Case# 1977-X0448-105.3 Received at Montgomery County Register of Wills Office on 09/30/2019 9:52 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*A13004-20*
*17 pgs*

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION
No. 1977-X0448

\* \* \* \* \*

ESTATE OF ROBERT L. MONTGOMERY, JR., DECEASED
Sur Trust for Herbert B. Chadwick (Trust No. 6)

\* \* \* \* \*

The fifth account of PNC Bank, N.A.[1], trustee of the testamentary trust created under Item FOURTH(A)(4) (hereinafter refered to as "trust No. 6") of the will of Robert L. Montgomery, Jr., Deceased, was called for audit on June 4, 2018. The objections filed thereto by H. Beatty Chadwick (hereinafter "the objectant") were heard on February 26, 2019, and the matter is now ripe for adjudication

COUNSEL APPEARED AS FOLLOWS:

DUANE MORRIS LLP
By: Lewis R. Olshin, Esquire
For the Accountant

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE ATTORNEY GENERAL
By: David Dembe, Esquire, Deputy Attorney General
as *parens patriae*, for charitable interests

---

1. PNC Bank, N.A. succeeded Provident National Bank which was named as a trustee in Item TENTH of Robert Montgomery's Will.

1

THIS DOCUMENT WAS DOCKETED AND SENT ON 09/30/2019

UNREPRESENTED PARTY APPEARED
AS FOLLOWS:

H. Beatty Chadwick, objectant

The account shows a balance of principal and income in the amount of $468,139.89 composed of stocks, bonds, cash, and cash equivalents as set forth on pages 18, 19 and 40. Principal of $462,221.59 has been revalued as of February 15, 2018 at $571,026.86.

The account was filed to acquaint interested parties with the transactions that have occurred during the period of this administration (April 7, 2014 to February 15, 2018) and to seek Court approval of the payment of certain legal fees and costs from principal. The trust continues.

It is stated that all parties in interest, including representatives of those not *sui juris* and of those still unborn or otherwise undetermined, have had timely notice of the filing of the account.

The relevant terms of the trust are as follows: Subparagraph B.(2)(c) of Item FOURTH of the Will as reformed by a 1976 decree of this Court directs the trustees to hold one-sixth (1/6) of the residue of the decedent's estate in trust (Trust No. 6) and, following the death of the decedent's wife, Elizabeth B. Montgomery, to pay to the decedent's nephew, the objectant, for his life, in each taxable year of the trust, a unitrust amount equal to the lesser of (i) the net income of the trust for such taxable year and (ii) six percent (6%) of the fair market value of the

2

trust assets, valued annually on the first business day of the taxable year of the trust. The taxable year of the trust shall end on December 31. If the net income of the trust for any taxable year exceeds six percent (6%) of the net fair market value of the trust assets, the unitrust amount payable to the objectant shall include such excess net income to the extent that the aggregate of the amounts paid in prior years is less than six percent (6%) of the aggregate fair market value of the trust assets for such years. Any income not distributed shall be added to principal.

Elizabeth B. Montgomery died on September 13, 1980, and the trust continues for the benefit of the objectant. Upon his death, the remaining principal and income is distributable to the charitable organizations listed in subparagraph B.(2)(e) of Item FOURTH of the will as reformed by the 1976 decree.

The objectant filed fifteen objections to the account[2] all of which were heard[3] on February 26, 2019. The first five objections to the account raise essentially the same claim -- that the trustee's management of the trust is not generating enough income for the objectant. At the hearing, the objectant first called Francis J. O'Grady as on cross. Mr. O'Grady is the PNC officer in charge of investments for this trust and the companion trust (trust no. 7) of which the objectant is also the income beneficiary. Mr. O'Grady stated that the assets of both trusts are

---

[2] The objectant's filing lists eight objections to the account and seven to the trustee's petition for additional counsel fees. That petition was filed on November 13, 2017, and dismissed without prejudice by the Court on November 15, 2017. The requests for additional fees and costs are set forth as questions for adjudication in the trustee's petition for adjudication now before us.

[3] The objections to a companion trust under the Robert Montgomery will for the benefit of this objectant (trust no. 7) were heard at the same time as those to this trust. The No. 7 trust is being adjudicated contemporaneously herewith, and for that reason, there are multiple references to "accounts" and "trusts" (plural) herein.

3

allocated 65% in equities and 35% in fixed income. He explained the goal of this allocation is:

> to manage the trusts in a balanced and impartial way so that we can meet the needs of the income beneficiary as well as grow the principal relative to inflation and hopefully in excess of inflation for the reminder interest.

(N.T. 13.) The witness confirmed that the investment objective for this trust during the accounting period has been capital appreciation with current income as a secondary objective. (N.T. 23.) He agreed the trustee does not seek to achieve any particular amount of income. (N.T. 24.) When asked why the bank's strategy, in 1994, was to achieve a 5 percent income return, the witness explained that interest rates were much higher at that time, and the return from bonds was then close to 5 percent -- much higher than their return in the last five years. (N.T. 26.) The witness explained that investing the entire trust in bonds could maximize income, however, doing so would not be the balanced and impartial approach needed to treat all the beneficiaries fairly. The witness stated that increasing the bond content of the portfolio at present would increase the income by only a small amount. (N.T. 37.) In response to questions about investing the assets entirely in bonds, he stated:

> If we invest the portfolio 100 percent in fixed income, the income will flow completely to the income beneficiary, and we will not be . . . positioning the portfolio for potential long-term growth that can offset inflation and the negative impact of inflation, as well as grow the portfolio above the rate of inflation for the future charitable interests.

(N.T. 44-45.) He further explained the portfolio would not grow at all if the entire *res* was invested in bonds. Thus, over time, the balanced portfolio approach would assure growth in the trust assets that would benefit not only the remainder beneficiaries, but also the income beneficiary, as a higher net income would be generated in future years from a higher principal

4

balance than would be generated from an eroded principal balance. He denied the objectant's suggestion that the balance mix represents a judgment call to benefit the remainder parties at the expense of the income beneficiary. (N.T. 48.) He also added that the income beneficiary benefits from the growth of principal on the equities side because the equities throw off dividends that are paid to the income beneficiary. (N.T. 50.)

In response to questions by counsel for the trustee, Mr. O'Grady stated he has a master's degree in business and has been employed at PNC for thirty-plus years. Regarding the bank's process for establishing investment policies, he explained: "We have an investment review committee, and we have an investment strategy committee that set strategy for the asset allocations and sub-allocations in each asset category." (N.T. 54.) He stated the employees on the review committee do their due diligence regarding the various types of investments. The witness stated the asset allocation is of primary importance and the 65/35 allocation is ideal for the long-term objective of this trust. (N.T. 59.) He also noted that: "in the [present] low-yield environment, the dividend yield from equities is competitive with the current yield from bonds." (N.T. 60.)

Jeffrey Mills then testified as an expert for the trustee. He is employed as the co-chief investment strategist for all of the asset management businesses at PNC Financial Services Group. He stated he manages the overall investment direction of the firm from asset allocation to execution. His duties include researching, writing investment publications, meeting with clients, and interacting with the media. He described PNC's approach to developing investment

strategies as follows:

> It's a combination of a number of groups that work within our asset management group, my group, investment strategy as well as portfolio construction. They're responsible really for the implementation of the asset allocation, and then there is our investment adviser research group that does the due diligence for the menu of products we have to choose from to make those implementations. . . Our investment policy committee . . would be the committee that governs the actual assets allocation. We develop a number of different strategic allocations. So they would be long-term asset allocation profiles [for] different client types, from institutional clients, endowments, foundation, et cetera., to wealth management clients . . . So all of those are brought to that committee and voted upon by a fairly diverse group that represents not only our group in strategy but other groups throughout asset management in the multiple businesses.

(N.T. 71-72.) He stated that the investment strategy group members have regular contacts in person and by phone with the investment advisors. He explained that the investment adviser research group is responsible for the due diligence as to individual investments, *i.e.,* interviewing fund managers, checking their backgrounds, going on-site to the operations centers, etc. (N.T. 74.) He echoed Mr. O'Grady's testimony that a 65/35 asset allocation is an appropriate balance when there are both a current income beneficiary and charitable remaindermen. He added that approximately 40 percent of the equity portion of the portfolio is invested in the S &P 500 index fund and generates above-average dividends, and almost 9 percent is invested in iShares Select Dividend ETF (DVY) which is dividend-focused. (N.T. 77.)

The witness also reviewed a chart that ranked the major asset classes and their returns during each year from 2008 through 2018. (Exh. A-4.) He noted:

> In hindsight, it would be very easy to say, well, we should have picked this asset class or that asset class. As you see, as you go year by year, it's almost a completely random smattering of what is the best and what is the worst and in between. We need to build portfolios with the realization that we can't predict the future with perfect foresight. And

6

Case# 1977-X0448-105.3 Received at Montgomery County Register of Wills Office on 09/30/2019 9:52 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

understanding the historical behavior of asset classes. We know that we need prudent exposure to many, if not all, of these in order to build a portfolio that manages risk and tries to maximize the amount of utility, whether it's income or return, for the given amount of risk taken.

(N.T. 87-88.) He reviewed a chart comparing the annual returns from 2014 through 2018 for the Russell 3000 and the S & P 500 (representative indices for the U.S. stock market) to the returns for the Barclays Aggregate Bond Index (a representative index for the U.S. bond market) and to those of mixed portfolios. (Exh. A-5.) He explained that the chart demonstrated that an investment in bonds only would result in a dramatic decrease in principal and very little gain in the way of income. (N.T. 89-90.) On the subject of converting to all bonds, he noted that, if gains were realized from selling off equities to purchase bonds, there would be capital gains taxes to pay. (N.T. 92.) Mr. Mills opined within a reasonable degree of professional certainty that the trustee was prudent and followed an appropriate investment strategy for this trust. (N.T. 95.)

In response to the objectant's questions, Mr. Mills rejected the suggestion that he would advise the 65/35 mix to all clients if he were an investment manager. (N.T. 106.) He also rejected the objectant's suggestion that income should be emphasized if the income beneficiary is 82 years old (as is the objectant.) Mr. Mills stated:

> The trusts have always been and will always continue to be invested with the interest of both the current income beneficiary was well as the remaindermen in mind. Therefore, the 65/35 we feel like takes into account both current income and provides stable income, but we also need to be in a position where we're continuing to grow the principal for as long as that trust is around. So for us, regardless of age, we feel like this is the appropriate allocation.

(N.T. 107-08.) He reiterated that maximizing the income of the portfolio is not the objective.

7

Case# 197 /-X0448-105.3 Received at Montgomery County Register of Wills Office on 09/30/2019 9:52 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In response to a question from the Senior Deputy Attorney General, Mr. Mills stated the current allocation of the assets being held by the trust is the same as it was during the last accounting period. (N.T. 112.)

The objectant then questioned William Cotter, a vice president at PNC who has been trust administrator of this trust and the companion trust since 2017 (and is also an attorney). Mr. Cotter demurred to the objectant's postulation that providing income to the income beneficiary was "really the only purpose of setting up the trust." (N.T. 121.) He disputed the objectant's proposition that the trustee's primary directive should be to achieve the unitrust percent (6% as per the amendment to the instant trust) and stated:

> The way I read [the trust] is that the trustee should invest the trusts reasonably. Then if there is 6 percent . . . of income, [it] should be given out to you. If there is more than that, it should be capped at 6 percent and held and converted to principal and then left for the remainder beneficiaries. So it seems that you are qualifying it as a target whereas it seems to me to be more of a cap.

(N.T. 135.) The witness testified that, in response to the objectant's request in April of 2018 that the trustee exercise its power of adjustment to create more income, the objectant was told that PNC did not recognize any duty to adjust between the income and principal to produce the income equal to the unitrust amount. (N.T. 145.) He added that, in his experience, the power of adjustment is not exercised by PNC in trusts with charitable remaindermen. When asked if he saw any appropriate way to produce more income for the income beneficiary, Mr. Cotter said no, "other than perhaps manipulating investments into different vehicles which might lead to a minimal increase." (N.T. 149.)

8

The objectant's questions to the witness then focused on the fees paid to the trustee's counsel and whether the trust had paid duplicate bills. Mr. Cotter stated he authorized payment of $106,344.50 from this trust through August of 2017 in accordance with the Court's 2016 adjudication[4] of the prior accounts[5]. (N.T. 156.) Mr. Cotter gave his opinion that the legal fee of $91,000 incurred by the trustee for work in connection with the objectant's appeal[6] to the Superior Court from the 2016 adjudications was reasonable and necessary. (N.T. 162.)

In response to questions from PNC's counsel, Mr. Cotter explained the various adjustments, disbursements (including counsel fees) and distributions made by the trustee in accordance with this Court's February 24, 2016 adjudication and May 4, 2016 order sur exceptions. A chart was introduced into evidence to demonstrate the actions taken by the trustee in the period between July 31, 2017 and September 1, 2017. (Exh. A-12.) The witness explained that the firm of Duane Morris LLP was paid $95,933.51 from the principal of this trust.

The objectant's next witness was Thomas Davidson who has been head of the HSBC Trust Company in Delaware since 2018. He stated he has worked as a trust administrator and fiduciary adviser at various institutions since 1997. Regarding the trust *sub judice*, Mr. Davidson

---

[4] In the order sur exceptions, the Court *en banc* denied all 12 of the objectant's complaints and sustained the trustees' exception regarding the source of payment of counsel fees and expenses.
[5] The 2016 adjudication of the administration of trust no. 6 covered both the trustee's third and fourth accounts.
[6] The Superior Court affirmed the adjudication issued by this Court at 161 A.3d 392 (Table) (2017).

9

stated it is what is commonly known as a NIMCRUT (net income makeup charitable remainder unitrust) and described the origin of this type of trust as follows:

> You had this problem with the regular unitrust of depleting principal. The idea of the net income trust was to try to preserve the principal so you had that available for the remaindermen -- in these particular cases, charities -- but you were still providing income. And the net income makeup allowed you, basically -- in those years where you [earned] over the percentage you could pay out in addition to that percentage.

(N.T. 187.) When asked ways to generate additional income, Mr. Davidson suggested the trust language could be modified to define post-contribution capital gains as income. (N.T. 190.) When asked about changing the allocation of assets to benefit an income beneficiary, Mr. Davidson testified:

> [W]hether you are 65/35, whether you're 60/40, 70/30-- I mean pick your range -- within that range you're still balanced, *per se*, and you're not changing the income generation versus the growth that much. But sometimes just a small tweak, even though you might free up only a couple hundred dollars, sometimes that makes a difference to an income beneficiary. So you can do those tweakings. It doesn't get you a whole lot of difference normally on the smaller trusts. . . My understanding is that we're looking at trusts that collectively are between a million and $1.1 million. And so you are looking at a little over a half a million apiece, which doesn't give you a lot of room to play.

(N.T. 192-93). He commented that the present allocation of assets in this trust is in "a safe zone" and added: "I think you will find that most trust companies will consider that to be a good total allocation for total return." (N.T. 194.)

During cross examination by counsel for the trustee, Mr. Davidson suggested a trustee might change a 65/35 allocation to 70/30 "to ease some of the pressure that the trustee is under because of the income beneficiary." (N.T. 197.) Mr. Davidson acknowledged that he reviewed neither this Court's adjudications of the prior accounts filed for this trust nor the Superior

10

Case# 1977-X0448-105.3 Received at Montgomery County Register of Wills Office on 09/30/2019 9:52 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Court's opinion on this objectant's unsuccessful appeal from the last adjudication. He agreed there is no language in the trust document giving the trustee the discretion to invade principal for the income beneficiary. (N.T. 199.) He agreed that the trustee could not make a unilateral change to the trust to allow for principal invasions for the income beneficiary. (N.T. 202.)

Counsel for the trustee then presented the testimony of Neil Cass, a partner at the law firm of Duane Morris. He testified that he served as co-trustee of this trust through the adjudication of the last accounts, at which point his resignation became effective. Mr. Cass tallied the surcharges that the objectant had sought in connection with the prior accounts of this and the companion trust, and which were denied by this Court and the Superior Court, at $897,408.93. He identified three Duane Morris invoices showing the fees incurred by and services rendered to the trustee for this trust and the companion trust through the appeal period. (Exh. A-14.) He stated that the amount being sought has been reduced to $447,635.40. He explained the extensive filings and proceedings that were required in the surcharge litigation. (N.T. 224-226.) He explained that the firm performed the services in the most cost-effective way possible based on the experience and billing rate of the lawyers involved. (N.T. 227-29.)

The witness also testified in detail about the fees of $303,881 that the trustee had paid during the previous accounting period and the Court approved in the 2016 adjudications, and about the additional fees of $212,689 that were approved in the 2016 adjudications and paid during the present accounting period. He stated there was no duplication of fees paid to the firm. (N.T. 230-33.) He stated the trustee was not seeking approval of any fees for work related to the

11

justifying fees. (N.T. 237.) As for the compensation Mr. Cass himself received, he explained, "I received a commission for my services as a trustee, and I received legal fees for my work as an attorney. But I did not receive legal fees for my work as a trustee." (N.T. 239.)

Mr. Cass was asked on cross why time was spent preparing for the hearing on objections to the prior account before both the initially scheduled date and the date the proceeding actually took place. He explained that counsel had to review the issues and witnesses had to refresh their recollections. (N.T. 263.)

After careful consideration of the testimony and evidence and the parties' post-hearing memoranda, we must dismiss all of the objections (nos. 1 through 5) that relate to the objectant's pursuit of additional income. The testimony of the trustee's witnesses established that the allocation of assets is prudent, appropriate, and fair to both the income beneficiary and the charities. The objectant's own witness, Mr. Davidson, said as much. Mr. Davidson testified that, while it might be reasonable to increase the investment in bonds slightly, the increase in income would be minimal. His testimony that the trustee could -- not is obligated to -- seek to reform the trust so principal could be paid to the income beneficiary is problematic. Reformation would require Court approval and such a petition would surely be resisted by the Attorney General and the charities. The litigation would result in additional legal fees and would further deplete the trust. Furthermore, we note that the present allocation of assets is the same as during the previous accounting period, and the Superior Court affirmed our decision in the 2016

12

adjudications that the trustee did not violate its fiduciary duty by pursuing this investment strategy.

In objections nos. 6, 7 and 8, it is contended that trust counsel has been paid to date more than this Court previously authorized. In the 2016 adjudication of the fourth account, this Court approved fees of $110,563.83 from principal as shown in the account on page 16 and fees of $43,874.00 from income as shown on page 34, for a total of $154,437.83. In the 2016 adjudication, the Court also approved the payment of additional fees and costs of $106,344.50, as requested in part D of the rider to question 13 of the petition for adjudication. Mr. Cass testified that these additional fees and costs were paid from the trust in three installments ($364.99 on June 24, 2015, $9,986.00 on December 31, 2015, and $95,993.51 on August 9, 2017). He demonstrated clearly and methodically that the firm was paid the proper amounts. The objections alleging overpayment are therefore dismissed.

The remaining objections can be summarized as follows. Objections nos. 9 and 11 contend the additional fees and expenses now being sought are not fair and reasonable in relation to the work that was needed. No. 10 claims that these fees were covered at the hearing on the objections to the prior account. Nos. 12 and 13 suggest the law firm seeks to be paid fees for its time pursuing fees and filed the account solely for the purpose of obtaining additional fees. No. 14 objects to counsel fees attributed to Neil Cass who was a witness at the prior hearing, contending his role was that of trustee, not of counsel. No. 15 asks the Court to exercise its

13

equitable power and deny any additional compensation because the trustee has not acted with "clean hands."

On the subject of determining the reasonableness of fees, as we stated in our 2016 adjudication of the prior account for this trust:

> The well-established factors set forth in *LaRocca Estate*, guide the court in its determination of what is "just and reasonable" compensation given the specific circumstances. *LaRocca Estate*, 431 Pa. 542, 246 A.2d 337 (1968). The *LaRocca* factors include: (1) the amount of work performed; (2) the character of the services rendered; (3) the difficulty of the problems involved; (4) the importance of the litigation; (5) the amount of money or value of the property in question; (6) the degree of responsibility incurred; (7) whether the fund involved was created by an attorney; (8) the professional skill and standing of the attorney in his profession; (9) the results he was able to obtain; (10) the ability of the client to pay a reasonable fee for the services rendered, and (10) very importantly, the amount of money or value of the property in question. *LaRocca Estate*, 431 Pa. at 547, 246 A.2d at 339. *See also, Wanamaker Trust*, 30 Fiduc. Rep. 240 (O.C. Montg. 1980). In *Thompson Estate*, 426 Pa. 270, pages 281—282, 232 A.2d 625, page 631, *supra*, the Court pertinently said: 'It is a 'well-entrenched rule of law in this State that the responsibility for determining the amount of counsel fees rests primarily with the auditing judge. An executor or a trustee is an officer of the orphans' court and accountable to such court for all his actions of commission and omission in the performance of his fiduciary duties; such duty to account embraces all payments made from estate or trust funds by way of compensation to himself or his counsel. *Thompson Estate*, at 276, 678.

(Slip opinion, pp. 11-12.) The evidence produced at the hearing established the extraordinary amount of work by counsel that was needed after the prior account was filed, which included defending the account against the objections, filing exceptions to the Court's adjudication, and litigating the objectant's appeal before the Superior Court. The trustee's counsel accomplished the tasks at hand at all stages, having fended off an $800,000+ surcharge request, having obtained a successful result on the exceptions before the Court *en banc*, and having prevailed

14

Case# 1977-X0448-105.3 Received at Montgomery County Register of Wills Office on 09/30/2019 9:52 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

before the appellate court. These services were clearly necessary and were rendered by counsel from a highly-regarded law firm. The objectant, due to his training as an attorney,[7] had the option of litigating without incurring any counsel fees. A corporate trustee cannot appear *in propria persona* and PNC was obligated to retain counsel who could defend it competently Accordingly, objections nos. 9 and 11 are dismissed.

The trustee established that the additional counsel fees now being sought are not duplicative of amounts previously considered by the Court and objection no. 10 is dismissed. In addition, counsel for the trustee took pains to establish that the additional compensation being sought related only to legal work performed in connection with the litigation relating to the prior accounts up through the appeal process, not to time expended to substantiate the fees. Objections nos. 12 and 13 are also dismissed.

Regarding objection no. 14, Mr. Cass testified he received commissions for his work as a trustee and charged for his time as an attorney when he was serving trust counsel. The objectant offered no evidence to the contrary and this objection is dismissed.

Finally, the objectant suggests no additional fees and costs should be allowed on equitable grounds. No grounds for disapproving any of the trustee's actions having been established, we find this objection no. 15 to be wholly without merit and it is dismissed.

---

[7] The objectant was admitted to the practice of law in Pennsylvania in 1961, but his license has been suspended since 2005.

In the rider to question 14, Part I, of the petition for adjudication, the trustee requests approval of the fees and costs discussed at length above. Having determined the amounts were reasonable and necessary, we approve the payment of $232,925.61 from principal to Duane Morris. In Part II to the rider, the trustee also asks the Court to approve a disbursement from principal not to exceed $15,000 to the firm for payment of reasonable attorneys' fees and costs incurred by the trust in connection with the preparation of the account and the petition for adjudication and for the presentation of the account at audit. This request is also approved.

Upon confirmation of the fifth account, PNC Bank, N.A., trustee, is hereby discharged and released from all liability with respect to the trust herein and the beneficiaries thereunder for its administration of the trust from April 7, 2014 to February 15, 2018, in accordance with this adjudication.

Subject to the views expressed herein and to distributions heretofore properly made, the net ascertained balances of principal and income are awarded to the trustee for further administration.

AND NOW, this  2 7ᵗʰ  day of September, 2019, the fifth account is confirmed.

A motion for reconsideration of this adjudication may be filed within twenty (20) days from the entry hereof. An appeal from this adjudication may be taken to the appropriate appellate court within thirty (30) days from the entry of the adjudication. *See*, Pa.O.C. Rule 8.2

16

and Montgomery County Local Rule 8.2A, and Pa. R.A.P. 902 and 903.

BY THE COURT:

LOIS E. MURPHY, A. J.

This adjudication efiled 7/30/19
Lewis R. Olshin, Esquire
David Dembe, Sr. Deputy Attorney General
Herbert B. Chadwick, *pro se*

17